We have another matter deal with to train. Yes, thank you judge more. It's my pleasure to move for the admission of. Like, a Catalina Rodriguez, there's a member of the bar and good standing with the highest court of Illinois. And move for admission to our court. I have knowledge of her credentials. And I'm satisfied that she possesses the necessary qualifications. I have a couple of other words to add here and I just wanted to say to Miss Rodriguez that, you know, time flies when you're working hard, right? And I say working hard because of your exemplary work ethic. Marked by professionalism and excellent work product. You brought these characteristics, not just to my chambers. But to the entire court, and I tell my colleagues and everyone gathered here that our legal profession. Is in good standing because of orders. I was for years well, with that judge Toronto's agreement, I am happy to grant the motion. Please turn to work. We'll swear. You in a member of our bar. You will report yourself as an attorney and counsel of this court uprightly and according to law and that you will support the Constitution of the United States of America. Welcome to the United States Court of Appeals for the Federal Circuit. Thank you. Okay, now we'll move on to the first case for today. Internet machines versus cyclone micro systems. Mr. Utley, you may proceed. May it please the court. I'd like to address 2 principal issues along with the courts questions and rely on the briefs for the remainder. 1st, PLX and its customer defendants appeal the trial courts denial of their motion for new trial. On the basis of 0 to micro versus beyond innovation. Under the applicable standard of review, this court should reverse a denial of emotion for new trial. If the district court abused its discretion, or if the determination constituted a misapprehension of laws. To be clear, we are here, not because of the claim construction, the court made, but because of the claim construction that the trial court refused to me. Can I ask you this? And this is what I guess I'm stuck on on the O2, and that is basically whether you preserved it. You had a motion about the claim construction ahead of trial. You said this is unambiguous. And you made the motion because the expert in deposition had said some things that you thought were inconsistent with how you understood the claim construction to what it meant. And the judge said they're not going to be able to testify inconsistent with the claim construction. And at that point, no more motions from you. That is at trial. If the other side had put on testimony or offered argument that was actually inconsistent with the claim construction. It seems to me what O2 micro says is you have to say, oh, there's now a ripened claim construction dispute. You didn't make such a motion by way of objecting to the testimony or by way of asking for a further claim construction in the jury instructions. So I don't see that you preserve an O2 micro argument. Can you tell me why? How many ways I just said something incorrect? Your honor, I understand the question and yet when an argument is pressed below such that the district court has an opportunity to rule on it, that argument is preserved for appeal. Here, we made the precise argument that we are making here before trial to the trial court, including a suggestion that the trial court prevent the expert from providing such testimony. The trial court denied that motion. We renewed that motion following trial and asked the court for a new trial. At that time, Internet machines made the precise argument that's being made here that it made in its briefs that we had waived that argument. The court, the trial judge assessed the facts before him and determined that in fact, we had not waived the issue and he ruled on the issue again. So we stand here today with a trial court that has considered this issue twice and ruled upon it twice, including ruling upon the waiver issue. Can I ask you this? I don't remember the details and I'm not sure that this is ultimately important to my question about preservation. But if I'm remembering right, your pretrial motion objected to a bunch of the experts, the other side's experts testimony that went way beyond this point about configure and configurable or already configured. And if I remember right, it's only in the conclusion section of your motion that you actually make a point really in the way of a request about configure versus configurable so that I read that motion fundamentally to be about something different. Your Honor, I believe on pages four and five of that motion, if I'm, if my memory serves me, we laid out precisely this argument that we understood the court's claim construction, namely the phrase associated with to require a switch with ports configured to be two transparent, one non-transparent. But that we understood for the first time from Internet Machines expert that he intended to provide an opinion and had an opinion that merely switches configurable in that manner infringed the asserted claims. We asked the trial court specifically for clarification, not of the meaning of the phrase associated with, but of the proper scope of that claim term. And in fact, in the, when I look at your motion for clarification, it says on the, you only have 1 sentence and it's on the last page says a district courts construction of non transparent or does not mean a. I read it because it does not mean a port physical interference merely capable of being associated with a non shared address domain. Was there a ruling on this on that sentence on that argument? The trial court refused to provide clarification. What we were arguing is that before the jury, there would be a dispute of the asserted claims scope. And in fact, that dispute was presented to the jury multiple times through Internet Machines expert repeated testimony, very clear testimony I might add on Internet Machines view and scope of the claim versus PLX's scope of the claim. He ultimately opined that under Internet Machines view that PLX infringed not because it switches were configured, but merely because they were capable of being configured. PLX's expert on the other hand, testified that PLX and its customers did not infringe because in fact, their switches were not configured and when the jury charge came, the trial judge actually charged the jury. Much of your job in this case will be claim interpretation. It was legal error for the jury to have been left with that determination. And it's determination of infringement was infected by that legal error. This court in 02 Micro said when the parties raise a fundamental dispute over the scope of asserted claims, that legal question must be determined by the court and not left to the jury. It was plainly brought to the court's attention, yet he abrogated his duty to provide that clarification. You know, we see so many cases where people want the district court judge to construe the claims to such a degree of precision that it moots any need for fact finding because the claim constructions basically comes down to their product falls within it or doesn't. And I guess I'm wondering what stage in this particular process in your case is a claim construction and in which case is a part of the infringement inquiry, which would be a question of fact to the jury. Namely, what does it mean to be associated with? At what point in time has he rendered enough legal legal words to allow the jury then to figure out whether two different particular configurations would satisfy it? Your Honor under 02 Micro, the purpose of claim construction is to resolve the disputed meaning and scope of the patent claims asserted to be infringed. The court went on to say, and when necessary to clarify and explain what the patentee covered by the claims here, we had a fundamental dispute. There was no dispute over the functionality of the switches at issue. The fundamental dispute was over. Do these claims cover switches that are capable of including the requisite ports? Why isn't that a question for the jury? Why isn't that infringement quintessential infringement? Your Honor, whether the claims cover, capable of, or configured is a meaning determination, not a factual determination. The factual determination could have been, are these. The claim just says non-transparent ports. That's all it says. He then said in order to construe the words non-transparent ports, let me explain. It means ports associated with a non-trans, I'm sorry, associated with a non-shared address domain. That was his construction. What's wrong with that? I don't see anything wrong with that. Why not leave it to the jury to figure out whether or not this particular switch in its particular configuration does in fact have a port associated with a non-shared address domain? Because in this case, the jury was left to make the legal determination of whether those claims actually brought such a product within their scope. This wasn't a dispute over the operation, functionality, capability of the switches. It was a dispute over what do the claim terms mean. The parties did not dispute what does associated with, in quotes, mean. Both argued it's ambiguous, unambiguous, I'm sorry. And yet, the parties presented to the jury dramatically different scopes of the claims. That issue did not arise until after claim construction, notwithstanding Internet Machine's arguments. At claim construction, the dispute over the constructions of non-transparent and transparent was whether PLX's construction limited the scope of the claims to one type of actual configuration. I'm sorry, three types of actual configuration. Internet Machines argued that that construction was too narrow because there were other methods of configuration. Internet Machines never argued that configuration was not required, not until after fact discovery. After claim construction, when it became clear that neither PLX nor any of its defendant customers ever actually configure a switch to include two non-transparent ports and one non-transparent port. And as you were reading, Your Honor, that's the plain language of the claim. Claim one of the 552 is illustrative. A switch with transparent and non-transparent ports comprising. This court has said that's synonymous with including a first transparent port, a second transparent port, a third non-transparent port. They argued for the first time after fact discovery that merely being capable of including those ports would suffice. That's a claim scope argument. We felt associated with could not feel like every single under your interpretation. I'm finding it not palatable because every single possible infringement argument is morphed into a claim construction argument by you. And there would be no basis for ever sending literal infringement to a jury under your proposed scope of what constitutes claim construction versus infringement. Your Honor, I would respectfully disagree, and I disagree for this reason. If the court had clarified and said the scope of these claims covers switches capable of such configuration, then the jury's non-infringement or infringement analysis would be. Are we looking at switches that are capable of such a configuration? On the other hand, if the court had said these switches must, as the claim reads, actually include such ports, then the jury would be looking at switches and at expert testimony to determine. Although these switches are capable of multiple configurations, does any of those at issue in the case actually include such a port? I think we have your argument. You are well into your rebuttal time. If you'd like to save any of it, I think we're going to have to turn to your opposing counsel. I would. Thank you, Your Honor. Mr. Edmonds. Thank you, Your Honor. As to the O2 micro issue that was just raised, I think the judges have hit on most of the high points here. Why isn't he right? The claims say non-transparent ports. It doesn't say stuff that could be configured to become a non-transparent port. It says non-transparent ports. It either is or it isn't. A wheel is round. The fact that you start off with a square wheel and you could pull out your sander and make it round doesn't make it round to begin with. I think that gets into the issues of infringement in terms of... No, I don't see how it does. Either you have a non-transparent port or you don't have a non-transparent port. I agree. And the technical analysis from the plaintiff's expert was that there was a non-transparent port. That was a technical analysis. That was the infringement case. He said there's a non-transparent port because it can be configured to become a non-transparent port, not that you have one. That's not what he said. He said it's a non-transparent port because all the logic and structures for non-transparency are present at the port by design and at manufacture. That's what he said. He didn't say you have to configure it. They're mischaracterizing what our expert said. They're mischaracterizing our case. This characterization of that our position was it just had to be capable of doing something is something that was never argued at trial. That was never presented from our expert. Our expert said it is associated with a non-shared address domain because of these technical reasons for infringement. And it was an infringement issue. It was not a claim construction issue. I think the main point is that both sides agree it was non-ambiguous. And that's what when they raised the quote clarification issue with the trial court and they said we agree it's not ambiguous. We're afraid they're going to controvert your construction. The trial court did exactly the right thing. The trial court said, okay, it's not ambiguous. I don't need to construe it anymore. Nobody controvert my construction. And there was no objection. But everybody argues whenever we have an interpretation case that it's not ambiguous. You just each argue that it's unambiguous in the way that you think it should be interpreted. Not that you both agree it's unambiguous and has the same interpretation. That may be the case in some cases. But if they're asking the court under O2 Micro to go in and to modify its construction to resolve something, then they have to, when they, I think it's inconsistent with that to say that it's unambiguous. And that both sides agree it's unambiguous. And more to your point, Judge Moore, that if the parties agree it's unambiguous and we have a dispute, then that's what the technical experts get into in terms of whether that claim limitation is met from a technical perspective as construed by the court. I didn't have a sense. Maybe correct me if I'm wrong. I thought you may have both said it's unambiguous, but you didn't agree on how it ought to be unambiguously construed, what it unambiguously meant. No, I think the parties, what the parties agree is unambiguous. The parties disagreed as to whether from a technical perspective, the limitation was met as construed by the court. That's what the real dispute was. They are, our expert and his testimony is quoted in our briefs. He said it is associated with a non-shared address domain because of these technical reasons. We had a technical dispute or I could call it a technical dispute because as the court saw, they did not really proffer a technical expert at all. Their technical expert just said I was told by PLX that it wasn't configured, therefore it doesn't infringe. He had no technical analysis to even back that up. Would this be a different case if I actually read the record and understood it to mean, which I, I get your argument, this is not the record. But suppose the record really did turn on, you had an expert that put up only capable of as his opinion. He didn't even hide it. He didn't suggest that, you know, it can fulfill it. It wasn't a technical dispute. He said associated with means capable of and their expert came up. I know this is not the facts of this case and said it's not good enough to be capable of. It actually has to be that way. It has to have, be a non-transparent part. Not you can convert it into one. You can configure it to be one. You can turn on functionality and make it one. It has to actually be that way. Suppose that were the case in front of us. Would that be a case that more squarely fell under the O2 micron sort of analysis? It might to some degree, but even so, in that case, then they could come in and argue, well, they've contradicted your claim construction. You've said it's associated. You've actually defined, further defined associated. And now they're coming in and they're using the word capable of. They're not using the word associated. And they just diverged from your claim construction. That would be a reason for them to object to do what the trial court said. If anybody diverges from my claim construction, we'll deal with it then. That would be a cause for them to possibly object to say we had diverged from their claim construction and the court could resolve it on that basis. But that wasn't what was done. And that's because they didn't object. Because they didn't object. And because that wasn't that wasn't our case. Our experts said that they are associated with a non-shared address domain because of these technical reasons. And what are those technical reasons? Because all the structures and logic for non-transparency are present in each port. The port, the port is a non, it has non-transparency. It has it. It's there. All the logic and structures are there. It's just a question of what's, what is visible to the device at any particular time. But they're all there. Is some activity that goes under the name configuring required to make it operate as a non-transparent parent port? The configuration is that the non-transparent registers would be visible to enumeration software. But they're there at, they're there. They're still there. They're at manufacture. It's a non-transparent port. And technically what actions are required to make that visible? I believe that there's a bit. So basically what you're saying is the port is both transparent and non-transparent. And it's simply when you hook up to it, the thing hooking up in the software is going to drive whether it uses it as transparent or non-transparent. But the device itself, the port is both. It has both characteristics. It has the structures for both present. It can immediately be used as either one. It is, it is both. As either transparent or non-transparent. It has both. It has, it has dual functions. Could you address the issue of damages and in particular the, the use of third party license agreements to establish the royalty rate? Yes. The, the third party licenses, the mobility licenses, you know, I think in very recently this court in just, just in April, in the Apple v. Motorola case talked about comparable licenses and whether something's radically different. And it talked about how this kind of thing goes to the weight of the evidence, not its admissibility. You're never going to find a license to exactly the same technology because it's patented technology. You're never going to find a license with exactly the same terms because all licenses have some differences. The expert testified that this, this was one factor of 15 that he considered. He testified. Would you agree you have to establish some sort of connection between the licenses and the, and, and the, the pens that issue? Well, yes. And there was the technical expert discussed at length how the split split bridge technology, the mobility licenses was comparable and technically similar, although inferior in some respects to the transparent, non-transparent technology of the patents and how there was the comparability between bridging and switching and doing something between different systems. And there was plenty of evidence for the jury to weigh as to whether these are comparable. I don't, I don't think their main argument is that they're not comparable. I think their main argument is saying that there were some, there were some issues of different scope. Our expert weighed those issues. Their expert was able to discuss those issues. Our expert discussed how those issues were offset by the fact that the mobility licenses had a fairly restrictive field of use and, and that helped offset that. And again, this is something that goes to the weight of this evidence, not its admissibility. And the jury was allowed to weigh it. There was plenty sufficient evidence. Some of the, some of the licenses, it seemed to be pretty, pretty broad. And for example, the mobility split, the bridge technology included patent software, trade secrets, design specifications, other IP assets. What was the apportionment of what, what attempt was made to, to apportion the value between these technologies and the technology at bar? Well, one thing is it's, it's unclear how much of that really existed or whether that's just boilerplate language, but our expert testified that he, he considered that and he offset it with the fact that those licenses had a narrower scope of a fairly restrictive field of use restriction, whereas the license in the hypothetical willingness negotiation wouldn't have a field of use restriction like that. Can I switch you to your cross appeal? Here's, I guess, my question. It seemed to me that the district court on the motion to compel thought, recognized that when the question is, where was a sale made? A number of facts relevant to the sale might bear on that question. And I think that's perfectly clear in our case law and lots of other case law besides. But then seemed to have concluded that there has to be a single answer to the, where is the sale made question, thinking that it has to be either Hong Kong or Taiwan, in this case, or the California office, rather than quite possibly being both for purposes of, of 271A. If, if that's, first of all, do you read the district court to say that? And if so, why would a remand not be needed to answer some questions about some of the facts, at least that I didn't find the, the answers to? That is, it need not, there's no singular answer to, did you sell in the US versus did you sell in Taiwan or Hong Kong? It seemed to me that the court, your comments are appropriate. It seemed to me that the trial court focused, essentially, he discussed some of the facts, but he focused nearly on one issue, that the initial delivery of the products was overseas, that they were manufactured overseas and the initial delivery was overseas. Delivered in, delivered in Hong Kong and free on board Hong Kong. FOB Hong Kong. What the court, I think, failed to appreciate and are factors that are highly relevant to the analysis is how we pointed out that this, for at least for contractual purposes, sale actually took place in California because it was acknowledged. Tell me, tell me about that. How do we know that what happened here was that, I think your view is there was an offer to buy accepted in California so that the contract was actually made at the moment of acceptance in California. An alternative view is that PLX had made an offer to sell, which upon submission of the buyer's bid, constituted an acceptance of the offer. So in that case, the contract would have actually come into existence wherever the buyer, presumably at the distributor's location in Taiwan or wherever. I couldn't find an answer to that characterization question. It seemed to me the excerpts of the depositions that were included danced around this. Can you clarify that? Yeah, I thought, I thought the evidence was quite clear that it's the acceptance that takes place. The acknowledgement is the acceptance. I see that. It seemed to me there was a very careful dancing around of the choice of words between acknowledgement and acceptance. And I did not see anybody saying the offer to buy was accepted at the California office. Well, I'd say, for example, the 30B6 designee, Mr. Whipple, when asked if there's any other way a customer would know that their offer, that their order had been accepted, he said, I'm not aware of one. I mean, it is the only way. That's what, that's, that's the device that provides the, the confirmed surprise, that provides delivery terms. There is nothing else you can point to in this chain of events that's the, that could constitute the acceptance. I think also what, what the district court failed to appreciate is that many of these products are ultimately destined for the United States and that the, they talk about the whole design win process and PLX's involvement, the design win process. There's, there's a very recent case I should at least bring to your attention. It's a district court case, Carnegie Mellon versus Marbell from the Western District of Pennsylvania, 986 F sub 2nd 547, in which the court allowed these worldwide sales into the, into the royalty base in part because they were going to be destined for products to come to the United States. So at a minimum, this, the fact that the design win goes on with PLX's involvement, which actually is what starts this entire process, gets them hooked, if you will, that PLX California accepts, are the ones who accept it and the contract takes place in California and then many of these products are ultimately destined for the United States. At a minimum, those products should be actionable, including because at a minimum, they're inducing infringement in the United States, but also we think it's infringement, direct infringement, and I think I'm just about out of time except for rebuttal, so I'll reserve. Well, actually you're down to one minute left of rebuttal time. I want to ask you one more question and we'll give you a minute or two of rebuttal. I want to ask you about 102A. What is your best evidence of corroborating an invent, your inventor's conception prior to the August 26 date of the slides that were prior arted issue? Well, I mean, I think that the, the 102, the 131 affidavits went in. I asked for the corroboration, not the declarance statements. I accept those on their face, but they have to be corroborated with independent evidence. So what is the evidence that you have that establishes a conception of a complete invention prior to August 26? Right, and it's in our brief. I'll try to find it in the brief time that I have because we went, we went through in our brief, we pointed out not, not just what they said, but they had literally hundreds of pages of documents, including a data book, and they had particularly, pointed specifically to a pin diagram where they had a non-transparent pin. All this was in, the 131 affidavits were not just, not just words. There was extensive documentation. I've read every single exhibit attached to them. The problem is the only one that had a diagram that actually showed the invention, arguably, was the one that was post-dated, the conception date. It was dated, I believe, August 29th. It was the only thing that had a diagram that showed, and that, I'm having a little trouble figuring out how I can put that before August 26th, when that diagram was three days later. And when in fact, I mean, you know, I could have conceived of it and drawn that, drawn that diagram in 10 seconds. Like, there's nothing about the diagram itself that suggests to me it would have taken weeks or months to have generated. Yeah, I think, I think it's, it's, it's not necessary to have a diagram. There are, there's argument made that you had to have a, a drawing in the patent. There's not necessarily a diagram. The, the technical documentation that was submitted in connection to 131 affidavits, including the data book for the product that they were developing was plenty sufficient to show that they had conceived of adding the non-transparent port to their switch product. And it's all, it's all, there's not a diagram of it. There's a, there's a pin diagram where it actually says in, it says non-transparent on the pin. You're talking about exhibit J to the pin diagram, PES48G, and on that pin, it does say TRNSPRNT pin, which could be, I guess, arguably used for a transparent and non-transparent mode selection. But interestingly, there's actually nothing at all that tells us how that chip or anything about that chip works. You literally just have a pin diagram that happens to have that label on one of the pins. It's a little difficult for me to conclude that that is necessarily a PEC switch with all of the other criteria that the claims otherwise require, because there's nothing in exhibit J that gives any detail about anything at all associated with that switch. All right, I'd also point you to, at 16454 through 455 of the appendix, our requirements for a dual port device that had transparent and non-transparent pins or modes, it was dated 11-25-2002. There were press releases and a lot of emails going back and forth talking about development of the switch device that had the transparent and non-transparent modes that were sent forth in the PEB20. To make sure I am on the same page with you, the preliminary exhibit E, which is the November 25th, 2002 document you're referring to, is a before-built, before-designed expectation of what you're hoping PEB-20 will contain. It's not a document that actually documents what PEB20 contains. It's a document that says, we are developing a product that will contain these things. That's a sort of, isn't that a wish list? That's not a, we have developed a product, here's how we're going to make it work. That's a, we intend to develop a switch that has both transparent and non-transparent capability. But there were sufficient details in those requirements. And also, back to the PIN diagram, the transparent PIN, the declaration was that the PIN indicates transparent, non-transparent mode. And I think that's sufficient corroborating evidence of that. It's not a PEC switch. That's the problem you have. There's no evidence that it's a switch that otherwise contains the other elements of this claim. The PES48G was a switch. I think that there's, I think that's what that PIN diagram is pertinent to. Okay. Okie doke. I'd like to extend his rebuttal time by two or three minutes if he needs it. Let me begin with the cross appeal. What constitutes a sale subject to U.S. patent laws as this court is well aware is governed by federal law and this court's precedent, well settled precedent, as I understand it, the legal predicate for internet machines argument is California state law, which I don't understand to have applicability or to be governing in this context. Well, let me just see if I can sharpen the way what I'm concerned about. It seems to me from our cases, Transocean and the predecessors make really quite clear that there is no necessarily single place of sale. But it's what the cases say is a variety of circumstances that surround a sale transaction can suffice to lead to the conclusion that there was a sale here. And so, and it seems to me that that aspect of our law, that there's no necessarily single place is precisely what the district court here didn't get that seeming to think that you look at a bunch of things and then you pick one place. And if the contract was actually made here by an acceptance in California, why is that not sufficient for there to have been a sale in California, even if there was also a sale in Taiwan or Hong Kong? Your Honor, first, my understanding of Transocean is that the location of contracting is not determinative, but normally it is manufactured. Right, but determinative is the kind of word that is getting us into trouble. It can be not determinative in the sense that other facts can also make the sale somewhere else, which is one meaning of saying it's not determinative. But Transocean, the light cube, specifically talk about how something, one location is also a place of sale. So why isn't there a sale in California here, even assuming that there was a sale in Hong Kong or Taiwan? Because under the facts before this court, I don't believe a sale could have taken place in California. Mr. Edmonds points to 30B6 testimony. That same witness was asked, is that the place of acceptance? And I want to quote his answer again. I think you're implying something legalistic here. I don't think that's what we're doing. We're simply telling them when we expect to be able to ship the product. Can you address directly was there an offer to buy that was accepted? And if so, where? Or was there an offer to sell that was accepted? And if so, where? The offers to buy, sell, took place outside of the US for some Asian regions in Taiwan, I believe the evidence and testimony said. So if there was an offer to a buy, who accepted the offer to buy? The distributor in that region of the country. The distributor. Is there something that says the distributor? I may be using, I apologize for interrupting. I'm sorry that the distributor had authority to accept a switch customers offer to buy. In fact, Your Honor, the PLX employees who testified, testified that the person in California was not at liberty to negotiate terms, to cancel an order, to reject an order, a purchase order with purchase price, quantity, product being purchased, and requested ship date, according to the testimony, is all negotiated and entered into outside of the US. And it's binding on PLX the moment that the distributor takes the order? That was my understanding of the testimony, Your Honor, and that all that took place. I looked very hard for that. And it seemed to me everybody was dancing around that fundamental question of when the contract was consummated. I'm sure the witnesses were not willing to give legal conclusions. And that may give rise to some of the seeming dancing. But the facts of negotiation of those terms, the entering into of the purchase order, the placement of it with a distributor that then sends it to PLX in California for the purpose in California, not of negotiation or rejection, but of simply confirmation that the ship date requested can actually be met. I didn't recall or see contrary testimony to that. I heard a lot of attorney argument to that effect. I've heard a lot of attorney argument to the effect that these products are bound for the US. But the testimony was PLX sells to distributors who in turn sell to contract manufacturers, who in turn sell to electronics and manufacturers. And the PLX doesn't track, doesn't direct, has no knowledge of what becomes of those parts after they leave its possession and title passes. Is there any evidence that these switches reentered the United States? Not one piece of evidence, your honor, other than speculation on the part of. So your opponent mentioned white sales, which I take to mean imports of the infringing products. Was there any evidence of that? All of PLX's imports were disclosed and were at issue in the trial. There is no evidence, no testimony was taken from any third party customer. No subpoena was issued to any manufacturer or distributor about its importation. Simply the speculation of Internet machines and its demand for not evidence of importation. Its motion is a demand for sales and financial information, total sales revenues on sales that did not touch the United States. Okay, Mr. Utley, I think we have to move on. Thank you for your argument. Mr. Edmonds, I'll give you two minutes of rebuttal time, which should keep the time about even between the two of you. Keep in mind your rebuttal is limited to your cross appeal. Thank you, your honor. As far as the question, whether there's evidence of imports, the evidence was that the testimony from PLX witnesses that we cited in our brief was that they have worldwide sales, that they have design wins with companies, well-known U.S. brands. The challenge was because the district court denied discovery into these sales, we were denied the ability to go in and actually take discovery to find out which of those products actually come in the United States or not. It's a kind of a catch 22 to say, well, I'm going to deny you discovery and now you have to speculate as to what the extent of imports were. That was in part one of the purposes of discovery was to find out the extent of the import. Did you introduce any evidence of publicly available data like some of the import statistics that the Department of Commerce keeps on imports? Those statistics, I mean, PLX admitted they import their own chips. The question is a larger device from someone else, HP or whomever, how would you know that that is in the HP device? That's not going to be indicated on the import paperwork. That's going to be, okay, an HP laptop or server or whatever. So you couldn't find it there. We needed discovery of these customers so we could find out how much was being imported in the U.S. We knew that their customers were U.S. customers. We knew they got the design wins. We knew these customers have consumer products that are ubiquitous in the United States. And we knew that PLX said we have worldwide customer base. We have our products worldwide. I think there's plenty of evidence there. And just to be clear, the discovery that was denied was discovery of third parties? A discovery of, yeah, we need to know who these parties are. You need to know what discovery and of whom were you asking for that was denied. Discovery of PLX to find out who these third party customers were so we could go then take discovery from them and find out the extent of imports. You knew the kind of companies that would use these switches. Did you seek discovery without permission of HP or other computer makers? We know the kind of companies, but if we went out and just started subpoenaing companies saying we think you have these infringing switches, we want your sales numbers, we're not going to get anywhere with that. We'd need definitive evidence from PLX as to who's incorporating these switches, the infringing switches in its products, so we can go out and take specific discovery there. I don't think any court in the land would let us just go take official evidence. Did you have any data that infringing articles were being imported regardless of where they came from? No, we were denied discovery of the data. I mean, that's the thing. We know that they have customers who are U.S. manufacturers they make the design win to. As PLX described its process, its products go to a distributor which goes to a contract manufacturer which goes to the ultimate manufacturer. The ultimate manufacturer are worldwide companies, household names. And so, I mean, we do know they're here in the U.S., but we need real discovery to find that out and that's what we were denied. What is it that you know that's in the United States, the infringing devices? Well, we know that there are a lot of products that from direct importation are put into infringing devices, a lot of consumer products, a lot of business products. We also know that that's only a percentage of PLX's worldwide sales. And of course, most, as we all know, most electronics manufacturing takes place overseas. The finished products are imported in the United States. We know that. I mean, there's no mystery there. I'll also speak to, I think there's been a mischaracterization of the testimony. I do think that their witnesses tried to muddy the water somewhat. But if you look at the deposition testimony that was cited for the trial court and it was cited in our brief, I think the testimony is very clear that Mike Grubesich's group in the U.S. had ultimate authority to reject these sales until the acknowledgment went out. There was no, there was no sale. That is the acceptance of the sale, back to your question. There was some testimony about that. They tried to, they tried to, to crawl fish from that, but that was the testimony of their witnesses. And it was pretty consistent. I had to keep time even and now you've gone two minutes beyond him. So we got to wrap up. Thank you, Your Honor. Thank both counsel for their arguments to the court. The case is taken under submission.